## MAGEE v. NORTH PACIFIC COAST R. CO.*

### No. 11,730; December 24, 1888.

#### 20 Pac. 709.

**Employer's Liability—Assumption of Risk.**—In an Action by a Brakeman against a railroad company for injuries received in a collision with an ox which was on the track through defendant's negligence in not keeping up proper fences, it appeared that it was apparent to anyone who looked at them that the fences were insufficient to turn stock; and it was known that cattle had frequently broken through them while plaintiff was in defendant's employment, when the train would be stopped, and the cattle driven off the track; and at least once plaintiff had assisted in driving them off. Plaintiff, a man of intelligence, had, as brakeman, ridden over the road along which the fences ran for some months. The court charged that if plaintiff knew the condition of the fences, or, as a prudent, reasonable man, should have known it, the verdict should be for defendant. Held, that a verdict for plaintiff could not be sustained, though he testified that he did not know the condition of the fences.

APPEAL from Superior Court, Marin County; J. F. Sullivan, Acting Judge.

Action for personal injuries by William F. Magee against the North Pacific Coast Railroad Company. From a judgment for plaintiff, and an order denying a motion for a new trial, defendant appeals.

W. H. L. Barnes for appellant; Hepburn Wilkins for respondent.

FOOTE, C.—This action was brought to recover damages from the defendant for the alleged injuries suffered by the plaintiff in being thrown from a train of cars operated upon the defendant's railroad track. The plaintiff recovered a judgment for $2,500; from which, and an order refusing a new trial, the defendant appeals.

The complaint alleged that it was the duty of the defendant toward the plaintiff, one of its employees, viz., a brakeman

*For subsequent opinion in bank, see 78 Cal. 430, 12 Am. St. Rep. 69, 21 Pac. 114.

and assistant baggage-master, to keep the right of way and track of its railroad "fenced with good and sufficient fence on both sides thereof, so as to prevent cattle and animals from getting on said track," and "to provide a good, safe and secure locomotive and tender, with a pilot cowcatcher in front thereof, and to run and operate its trains in such manner as to always have the locomotive in front of its train, and a pilot or cowcatcher in front of said locomotive engine, and in a position to remove obstructions from said track." It was then alleged that these general duties were unperformed, and that of their nonfulfillment the defendant had notice.

The charge was also made against the defendant that by reason of its negligence its railroad track and right of way were not at the time of the plaintiff's injury fenced with good and sufficient fences, by reason of which neglect a bull or ox got upon said track; and by reason of that, and the negligence of the defendant in running its locomotive engine with the tender in front, and without a cowcatcher, etc., the locomotive engine ran against the bull or ox, which collision resulted in the plaintiff (while using due care and attention in the line of his duty) being thrown off the car where he was properly stationed, and seriously and painfully injured.

There seems to be no doubt but what the facts show that the plaintiff suffered the injuries complained of through a collision of the train with the ox or bull, which had gotten upon the track through the negligence of the defendant in not keeping up proper fences. It is equally clear that the plaintiff was fully aware of the fact that the defendant's locomotive engine was run with the tender in front, and had been so run for a long time, and it is apparently conceded on both sides that under the evidence no cause of action existed in favor of the plaintiff on that ground. But it is insisted by the plaintiff, and denied by the defendant, that the negligence which caused the accident in which the plaintiff had his leg broken was by reason of the fact that the fences along the track were insufficient to turn cattle and stock, and that on account of the bad condition of the fences, well known to the defendant and unknown to the plaintiff, the bull or ox got on the track, caused a car or cars to be precipitated therefrom, the plaintiff violently thrown off and permanently injured.

The evidence unquestionably and without serious conflict shows that the fences were neither good nor sufficient; in fact, it appears from the evidence of all the witnesses who testified as to the matter that the fences were very bad; and this fact must have been apparent to even the most casual observer. They were composed of posts loosely set in the ground. There were but two planks, six inches wide and sixteen feet long, nailed parallel to each other from post to post. They were impaired by frequent nailing in some places, and could with difficulty be kept on the posts by nails. They were known to have repeatedly fallen off, or been pushed off by cattle which came out on the track. On various occasions during the time when plaintiff was in the defendant's employment the train would have to be stopped, and the intruding cattle driven off by the train hands, and upon at least one occasion the plaintiff had assisted in driving such intruding cattle off the track.

The plaintiff had been in the employment of the defendant for about a year and a half, and had been engaged for some months of this time in traveling upon its trains over the track and right of way, along which these insufficient fences ran. He declares in his evidence that he did not know of any defect in the fences, and that, so far as his observation went, they appeared to be good fences.

If it be conceded that the plaintiff paid so little attention to the fences as to suppose that they were good, it then appears that he acted in that respect in a manner entirely different from several other persons, who testify to facts from their observation which show that the fences would appear to any prudent man as being in a condition utterly inadequate to the turning of stock. The fences undoubtedly appeared to everyone who looked at, and who has testified as to, them, in the case, as bad and insufficient fences.

The evidence shows plaintiff to be a man of intelligence and acuteness; so that if he did not come to the conclusion, after abundant opportunity, that the fences were bad, it must have been because he did not notice them at all, when he should have done so. If he had been a reasonably prudent man, he would have known that the fences were bad; and that cattle, which were abundant thereabout, and had gotten on the railroad track, causing the train to stop until they could be

driven off, would do so again, and that a collision might take place, and he be seriously hurt.

Such being the state of the evidence, what was the duty of the jury in the premises, under the instructions of the court, unobjected to by the plaintiff, one of which was as follows: "If, on the contrary, you find that the plaintiff fully knew the unsafe condition of the fences at the place of injury, or, as a prudent, reasonable man, should have known their condition, then your verdict should be for the defendant."

It would seem that it was their duty to say that, as a prudent, reasonable man, the plaintiff should have known the condition of the fences at the place of injury, as many other witnesses who testified in the case stated facts about the fences which uniformly showed their condition to have been bad, and the plaintiff himself does not in any way whatever contradict their statements in that respect.

There is no conflict in the testimony as to the fences being bad—a fact which must have impressed itself upon any prudent man, viewing them as he rode past them day after day for months, if he had chosen to avail himself of an abundant opportunity presented to him of looking at them, and being compelled by such observation to note their wretched condition. The only conflict is between the statement of the defendant that he did not know they were bad and insufficient fences, and that of everybody else who looked at and stated them to be insufficient.

The plaintiff nowhere even intimates that the fences were not glaringly insufficient; in fact, he succeeded by the testimony of his own witnesses in demonstrating the truth of that matter. Yet he utterly fails in his evidence to explain how he alone, of all those who gave the fences any attention, did not observe their insufficiency. How, then, could he fail to know that the fences were bad, and appreciate the risk which he ran, unless he neglected, as a prudent man, to observe the condition of the fences, which were daily within his view? He does not say that he gave them any attention; he does not declare that those who did view them were wrong in their conclusion; he does not give any reason why he did not know their condition, which was patent to any observer; he contents himself with saying he did not know their bad condition, as they appeared to him to be good.

It is impossible, in view of the uncontradicted evidence in the record, that the plaintiff could have remained in ignorance of the insufficiency of the fences, unless he had willfully refrained from looking at them, or had utterly neglected to do so. In either event he did not act either as a prudent or reasonable man in his situation should have done.

In the case of Sweeney v. Railroad Co., 57 Cal. 15, the engineer, who was killed by the train colliding with cattle, was shown to have known that he ran a great risk because of the entire absence of all fences along the track, and the appellate court held that a recovery could not be had against the railroad company whose train he was operating at the time he met his death.

The jury in the case in hand either disregarded the instruction of the court, or found contrary to the evidence. We, therefore, advise that the judgment and order be reversed, and the cause remanded for a new trial.

We concur: Belcher, C. C.; Hayne, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order are reversed and the cause remanded for a new trial.